IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 5, 2018 Session

## C. BRUCE BATTEN v. COMMUNITY TRUST AND BANKING COMPANY, ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 10C366  Ward Jeffrey Hollingsworth, Judge**

_____

### No. E2017-00279-COA-R3-CV
_____

This appeal arises from the trial court's reconsideration and granting of summary judgment motions that had initially been denied by another judge.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., joined, and J. STEVEN STAFFORD, P.J., W.S., filed separate dissenting opinion.

John P. Konvalinka and Thomas M. Gautreaux, Chattanooga, Tennessee, for the appellant, C. Bruce Batten.

Gary R. Patrick and Susie Lodico, Chattanooga, Tennessee, for the appellee, Community Trust and Banking Company.

Gary S. Napolitan and M. Andrew Pippenger, Chattanooga, Tennessee, for the appellee, Kathryn Reed Edge.

## OPINION
## I. BACKGROUND

In 2001, Community Trust and Banking Company ("Bank"),[1] hired C. Bruce

_____

[1]Now known as Millennium Bank.

Batten to be its CEO and president. Under Section 3 of his employment agreement, Batten's base salary was set at $144,754 per year. Under that same section, Batten was to receive the following: benefits under or participate in stock options, retirement plans, supplemental retirement plans, pension plans, profit sharing plans, health and accident plans, medical coverage or any other employee benefit plan offered by Bank; medical coverage, bonuses, reimbursement for travel and entertainment expenses; reimbursement for cellular phone; an automobile allowance of $500 per month; and reimbursement for all non-use dues at The Mountain City Club.

The employment agreement required Batten to devote all his time, effort, and skill to the "organization, operation and management" of Bank. Batten acknowledged being ultimately responsible for overseeing loans and deposits, directing bank marketing activities, "setting loan and interest rates," and creating an incentive plan for getting new loans. In addition to these types of responsibilities, Batten also took it upon himself to "implement" and "develop" other specific job duties, including "picking up paper in the parking lot . . . every morning," "changing light bulbs," "routinely" using his truck to "pick up . . . broken furniture" at Bank's branch locations, clearing and then spreading straw on parcels of property owned by Bank with his tractor and trailer, and "routinely us[ing] his storage space . . . to store [excess] bank records . . . ." Additionally, Batten had Bank buy several grills and smokers during his tenure, culminating in the purchase of a $15,000 smoker that Batten described as a "very unique micro marketing tool" and "the most successful use of marketing dollars" while he was at Bank. The record reveals that Batten would smoke turkeys for customers and provide them Bank-purchased beer to drink while they watched him cook at his or "other people's" homes.[2] He admitted that some of these activities were "not typically . . . in the purview of someone's duties and responsibilities as the president and CEO" of a bank. Batten claimed, however, that his actions benefitted Bank and did not impair his job performance. Bank would eventually charge that Batten had shirked or delegated his administrative duties because such actions strayed from the administration of the financial institution.

Before any problems arose for the parties, Batten and Bank had entered into an amended and restated employment agreement in May 2005. Under its terms, Batten was entitled to voluntarily terminate his employment with Bank by providing sixty days' prior written notice:

> **4. PAYMENTS TO BATTEN UPON TERMINATION.**
> Batten may terminate his employment under this agreement by resignation upon not less than sixty (60) days prior written notice to the Bank. The Bank shall pay Batten his then

---

[2]According to Batten, one of his duties was to entertain existing and prospective Bank clients. He stated that purchasing food, alcohol, and other supplies was necessary to perform this duty.

current Base Salary and provide all of the benefits provided in Section 3 until the effective date of his resignation and for thirty-six (36) months thereafter. The Bank shall have the right to terminate Batten's employment under this Agreement by giving Batten sixty (60) days prior written notice. If the Bank elects to give notice to Batten of termination of his employment under this Agreement, for thirty-six (36) months after the effective date of such termination, the Bank shall pay Batten his then current Base Salary and provide all of the benefits provided in Section 3.

The employment agreement included no outside criteria, standards, or schedules.

In 2009, the Tennessee Department of Financial Institutions ("TDFI") initiated an examination of Bank. When TDFI completed its report, Batten and other Bank executives attended an "exit meeting" with the examiners on October 22, 2009. During the meeting, TDFI announced that the quality of Bank's assets had "significantly deteriorated" since its last examination; its earnings were "deficient;" its risk management practices were "inadequate;" its capital levels had "significantly decreased;" its management had committed "significant . . . violations [or] contraventions" of law; and its overall condition had "deteriorated." TDFI specifically discussed the component and composite ratings that it had assigned to Bank. In the first three quarters of 2009, Bank had posted losses of $1,176,000. Batten did not disagree with TDFI's appraisal of Bank or the majority of TDFI's conclusions. He now asserts, however, that although Bank struggled for a portion of the time that he served as president and CEO, the financial troubles could not all be blamed on him. He would note that the financial industry as a whole sustained historic losses and that many banks across the country failed completely. After the exit meeting, Batten signed a document certifying that he would help develop plans to address the numerous deficiencies identified by TDFI.

On November 2, 2009, Bank retained Kathryn Reed Edge, an attorney with the firm that represented Bank, to perform legal services in connection with TDFI's examination.[3] Batten, as president of Bank, signed Edge's engagement letter. Six days later, Edge prepared a "confidential Memorandum" for Bank in which she summarized and addressed the information provided by TDFI at the exit meeting. She noted that the following composite CAMELS ratings were being recommended by TDFI:

|  |  |
|---|---|
| Capital Adequacy | "3" |
| Asset quality | "4" |
| Management | "4" |

---

[3]In particular, Edge, who had previously worked for TDFI, was to assist in drafting an offering circular to raise additional capital.

|             |       |
|-------------|-------|
| Earnings    | "4"   |
| Liquidity   | "3"   |
| Sensitivity | "4"   |

In the early part of December 2009, Edge participated in meetings with TDFI and Bank's Board of Directors in order to discuss the findings of the examination report and Bank's financial condition. On December 7, 2009, she prepared a letter to TDFI's Commissioner, in which she acknowledged the nature of the various ratings that had been "assigned" to Bank. During this time period, Edge addressed with Batten the possibility that Bank might receive some type of formal supervisory action from TDFI.

Batten apparently became concerned about his future with Bank. He met privately with Edge to talk about his possible resignation and discussed with her a provision in the employment agreement that allowed Bank to terminate him "for cause." Because such an action by Bank would affect his right to receive severance payments, Batten questioned Edge as to whether Bank "could use" its current situation to terminate him "for cause" under the agreement.

According to Batten, he specifically asked Edge if she was aware of any reason why he might not receive his severance benefits, and she replied that she was not aware of anything that would result in the severance not being paid. He claims that Edge never disclosed to him that, due to the findings of TDFI, Bank would certainly be assigned a composite CAMELS score of 4; that, when a financial institution is assigned a CAMELS score of 4, pursuant to applicable federal regulations, it constitutes a troubled condition; and that such a bank is barred from making payments that constitute golden parachutes. Batten argues that Edge never informed him that his severance package could be considered a golden parachute. He claims that during their discussions, Edge advised him to tender his notice of termination to Bank in December 2009, as opposed to waiting, so that Batten would not be listed as CEO in Bank's upcoming capital circular.

After his conversations with Edge, Batten decided to voluntarily resign from Bank. Although Edge did not personally represent him, Batten asked her to compose his notice of termination. She forwarded a proposed draft to him by email with the following statement:

> Corky, I think this meets the requirements for notice under your employment agreement. Feel free to change it, but you may not want to be too specific about why you are tendering your resignation when you are. You may want to consult your own counsel about this, as well, as we discussed. What the Bank will want you to sign is a separation agreement that sets out what they are paying you and providing certain releases. This is customary and for both your protection and

- 4 -

the Bank's. When you are ready to deliver this to Ken Hamilton, I can draw up that agreement for the bank.

Until you tell me you are ready to deliver this, I won't talk to anyone about this, but we cannot wait long because we must amend the offering circular and prepare for management transition before we start talking to investors. I will need to talk with Greg and Ken Hamilton sooner than later.

I know how hard this is for you. Thank you for calling me about it. I hope the conversation helped you.

Upon his review, Batten requested that Edge add a sentence about his need to stop working because of his health, claiming that the work-related stress was affecting him and, also, that he was not physically capable of doing his job any longer. The revised notice provided, in part, as follows:

I have determined, after much debate and upon consultation with my health care provider, that the stressful and challenging position I hold at the Bank is contributing to my deteriorating health and that it is in my best interest and the best interest of my family that I tender my resignation.

In a later deposition, Batten testified that he "couldn't deal with the stress" – "mentally or physical" – of running Bank. He asserted that his health was deteriorating so much that it impaired his ability to work at Bank.

Batten tendered the resignation letter on the morning of December 21, 2009. He offered to help smooth the transition to the next CEO and requested that Bank pay him three-years' worth of contractual severance pay:

Pursuant to Section 4, Payments to Batten upon Termination, of my Amended and Restated Employment Agreement dated May 23, 2005, I may terminate my employment under the Employment Agreement by resigning upon not less than 60 days prior written notice to the Bank. The Bank is obligated to pay me my "then current Base Salary and provide all of the benefits provided in Section 3 [of the Employment Agreement] until the effective date of my resignation and for thirty-six (36) months thereafter."

After the notice was received, Bank placed Batten on medical leave, blocked his access to his email account and computer, and changed the locks on the building where

he had worked. In response to Bank's actions, Batten's counsel thereafter sent a letter to Edge demanding assurances that Bank intended to perform its obligations relative to the severance benefits.

In mid-January 2010, during the 60-day period following Batten's resignation notice, TDFI sent Bank the final version of its report. Regulators concluded that Bank was an "unsound," "deficient," and "ineffectively" managed financial institution. Around a month later, Bank received a letter from the Federal Deposit Insurance Corporation ("FDIC"), stating that Bank was officially in a "troubled condition"[4] pursuant to federal law. FDIC informed Bank that, among other restrictions, it could not make any "golden parachute payment or excess nondiscriminatory severance plan payment" to any officer or director without FDIC authorization. On February 19, 2010, Edge's law firm sent a letter to Batten stating that Bank would not "presently" tender the post-termination compensation. Thereafter, on March 10, 2010, Batten filed his complaint against Bank and Edge personally, alleging claims for breach of contract and quantum meruit/unjust enrichment. He subsequently amended his complaint to assert a claim for negligence against Edge.

FDIC's regulations allow a financial institution that is in a troubled condition and IAPs [institution-affiliated parties][5] like Batten to request permission to make otherwise

---

[4]FDIC's regulations define "troubled condition" as follows:

Troubled condition means any insured state nonmember bank that:

    (1)    Has a composite rating, as determined in its most recent report of examination, of 4 or 5 under the Uniform Financial Institutions Rating System (UFIRS), or in the case of an insured state branch of a foreign bank, an equivalent rating; or
    (2)    Is subject to a proceeding initiated by the FDIC for termination or suspension of deposit insurance; or
    (3)    Is subject to a cease-and-desist order or written agreement issued by either the FDIC or the appropriate state banking authority that requires action to improve the financial condition of the Bank or is subject to a proceeding initiated by the FDIC or state authority which contemplates the issuance of an order that requires action to improve the financial condition of the Bank, unless otherwise informed in writing by the FDIC; or
    (4)    Is informed in writing by the FDIC that it is in troubled condition for purposes of the requirements of this subpart on the basis of the Bank's most recent report of condition or report of examination, or other information available to the FDIC.

12 C.F.R. § 303.101(c).

[5]Institution–affiliated party (IAP) means:

(1) Any director, officer, employee, or controlling stockholder (other than a depository institution holding company) of, or agent for, an insured depository institution or depository

- 6 -

prohibited golden parachute payments. 12 C.F.R. §§359.0(b), 359.4(a)(1), (4), 359.6. On May 16, 2011, Bank's president at the time sent a letter to FDIC inquiring whether the entity would allow payment of the severance benefits to Batten. Bank represented to FDIC that, "Community Trust does not believe that the approximately $600,000 that would be paid to Batten qualifies as deferred compensation. The payment being requested would not have been compensation that would have been payable to Mr. Batten during the course of his employment and thus cannot be qualified as "deferred compensation." According to Batten, this statement was directly contrary to the terms of the employment agreement, noting the fact that Bank set up the Deferred Compensation Account, contributed to it on a monthly basis, accrued a liability on its financial statements relative to the payment of the severance benefits, and specifically characterized the severance benefits as deferred compensation on its financial records. On June 24, 2011, FDIC responded to Bank that, "based upon the information provided," it appeared that the severance benefits do not "fit any type of plan described in the regulation, and that the payment would qualify as a "golden parachute." FDIC further informed Bank that it would need to get its consent before making the payment.

Bank did not make such a request to FDIC pursuant to 12 C.F.R. § 359.4(a)(4) until August 2, 2012, over two and a half years after Batten's resignation. In its August 2, 2012 letter, Bank stated that it "is unable to make the certifications required by 12 C.F.R. § 359.4(4)(i) through (iv) or advocate for consent to make the payment due to our belief that Batten's performance as CEO and President did cause him to be substantially responsible for Community Trust's troubled condition." According to Bank, it had learned that Batten had established lending policies that negatively implicated numerous federal and state laws, incentivized the extension of excessive loans, and participated in questionable self-dealing with Bank insiders.[6] On August 14, 2012, FDIC responded to

---

institution holding company;

    (2) Any other person who has filed or is required to file a change-in-control notice with the appropriate federal banking agency under section 7(j) of the Act (12 U.S.C. 1817(j));

    (3) Any shareholder (other than a depository institution holding company), consultant, joint venture partner, and any other person as determined by the appropriate federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution or depository institution holding company; and

    (4) Any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in: Any violation of any law or regulation, any breach of fiduciary duty, or any unsafe or unsound practice, which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution or depository institution holding company.

    12 C.F.R. § 359.1.

[6] An employee with Bank asserted Batten's involvement in substandard loans, defaulted loans, etc.

Bank's August 12 letter, and requested that Bank provide the certifications required under section 359.4(a)(4) by August 27, 2012. When Bank failed to comply with FDIC's demands, on August 30, 2012, FDIC sent correspondence advising that Bank's request was deemed "abandoned."

Although Bank's Rule 30.02(6)[7] representative had testified on July 16, 2010, that Bank was not claiming Batten had been terminated for cause, on April 26, 2012, Bank's Board of Directors voted to retroactively terminate Batten's employment, effective February 20, 2010:

> WHEREAS, the Company has recently completed its written discovery responses, required by the Litigation, and has recently reviewed all documents related to Batten's performance as CEO and President of the Company from May 30, 2001 through his resignation on December 21, 2009;
>
> WHEREAS, upon careful review of the above-referenced documents, the Board finds, in its good faith opinion, that Batten was guilty of conduct justifying termination for Cause, within the meaning of the Employment Agreement, based on the following reasons: Batten is guilty of personal dishonesty, incompetence, willful misconduct, breach of fiduciary duty involving personal profit, willful failure to perform stated duties as defined by the Board's and the Company's policies, willful violation of the laws, rules and regulations as described in [TDFI]'s Examination Report for the examination beginning October 5, 2009 which materially and negatively affected the Company. The Board further finds that Batten's behavior was willful, as defined by the Employment Agreement, in that it demonstrated an intentional or reckless disregard for the duties and responsibilities he owed to the business of the Company. It is therefore,
>
> RESOLVED, that Batten shall be terminated for Cause pursuant to Section 7 of the Employment Agreement effective as of February 20, 2010, and that Batten shall not have the right to receive compensation or other benefits after said date; and, it is,
>
> FURTHER RESOLVED, that the proper officers of the Company are hereby authorized and directed to take all such action as they, and any of them, deem necessary or advisable to carry out the full intent and purpose of the foregoing resolution.

---

[7]Under Rule 30.02(6) of the Tennessee Rules of Civil Procedure, an organization named as a deponent "shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf . . . ."

Batten asserts that prior to April 26, 2012, no one informed him that he had allegedly engaged in illegal or unlawful conduct, that he had been dishonest or incompetent, that he had breached his fiduciary duty, or that he had willfully failed to perform his stated duties as Bank's employee. According to Batten, at all times, he relied upon Lloyd Congdon, Bank's Executive Vice President, Senior Leader, and Senior Credit Officer to ensure that Bank's loans were legally compliant. Batten stresses that Bank did not fail under his watch and, in fact, its assets were improving at the time he resigned. He notes two years of litigation occurred before Bank began blaming him.

Although Batten, as an IAP, had standing to seek permission from FDIC to have Bank make the severance payments, the record does not reveal any action on his part in this regard. He would have been required to demonstrate, among other things, that he "is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made" (1) that he committed any fraudulent act, breach of trust or fiduciary duty, (2) that he is responsible for the failure of the bank, or (3) that he has committed a material violation of banking laws and regulations that has had a material effect on the bank. 12 C.F.R. § 359.4(4); *see also* 12 U.S.C. § 1828(2).

In January 2013, Bank moved for summary judgment. According to Bank, the enforceability of the employment agreement between it and Batten was contingent upon continued regulatory approval of Bank's operations, which ceased when TDFI concluded its 2009 examination. Bank further argued that Batten breached the agreement by failing to faithfully perform his duties under the employment agreement. Additionally, Bank asserted that the payments sought by Batten constituted an impermissible golden parachute not subject to any statutory exceptions. Edge also sought summary judgment on Batten's negligence claim, arguing that the alleged misrepresentations about which Batten complained concerned future matters rather than misstatements of present fact.

The trial judge over the case at the time, Jacqueline Bolton,[8] denied the motions for summary judgment, finding disputed issues of material fact present. We denied a requested Rule 9 application for an interlocutory appeal.

Once the case was back before the trial court, Bank filed a motion for revision on October 1, 2015, under Rule 54.02 of the Tennessee Rules of Civil Procedure. The trial court accepted Bank's argument that there had been a change in the law concerning the summary judgment standard since Judge Bolton's denial of Bank's original summary judgment motion. Bank further convinced Judge Jeff Hollingsworth that the severance package constituted a "golden parachute" as that term is defined by FDIC regulations,

---

[8]Judge Bolton retired in September 2014. Two other judges recused themselves during the litigation of this matter.

and, because Bank was considered by FDIC to be a "troubled institution," it would be illegal for Bank to pay Batten the sums set forth in the employment agreement. The trial court, thereafter, reversed the earlier rulings on the dispositive motions. In its January 4, 2017, memorandum and order, the court set forth the following reasons for granting Bank's motion:

> Batten cannot prove that the conditions precedent for payment of the Severance Benefits were met. . . . Paragraph 19 clearly contemplates one condition being the loss of the Bank's charter . . . and the continued regulatory approval of the Bank's operations. Wording of the contract is clear and this Court cannot reconcile the findings of the [TDFI] and the FDIC with the term "regulatory approval." Therefore, it is the finding of the Court that the Bank met its burden on summary judgment in regard to that provision of the contract. Batten has not been able to produce evidence to create an issue of fact on that issue.

> . . .

> FDIC refused permission to make a payment the FDIC defined as a "golden parachute." . . . The FDIC told the Bank that, based on the information it had at the time, it could not allow the payment. However, if the Bank would make certain assertions concerning Batten's noninvolvement with the problems suffered by the Bank, the FDIC might reconsider. The only way the Bank could have responded to that would be to make assertions concerning Batten's noninvolvement, knowing at the time that the assertions were, at least from the Bank's point of view, not true. This Court is not aware of any duty the Bank had to make what it considers untrue statements to the federal agency which regulates it. In any case, Paragraph 19 clearly states that the continuation of the agreement was contingent upon regulatory approval. At the time Batten's resignation became effective, the Bank did not enjoy regulatory approval.

> . . .

> Finally, it is undisputed that the FDIC informed the Bank that it was prohibited from making the payments without FDIC consent. If this Court ordered the Bank to make those payments, that would be in direct conflict with federal law.

- 10 -

Under these circumstances, federal law preempts. Mr. Batten may pursue his remedies in the federal system.

In regard to Edge, the trial court noted as follows:

As Edge argues in her motion, the misrepresentation, if it was such, is about a future event. The only misrepresentation Batten accuses Edge of making is her failure to warn him that he might lose the Severance Package in Paragraph 4. Edge argues that, even if that is true, it is a misrepresentation concerning a future event for which there can be no recovery. . . . It is clear that, even if Edge's failure to mention the adverse effects of Batten's resignation was a misrepresentation, it related to what might happen in the future. At the time Edge failed to issue the warning Batten claims should have been made, the report of the TDFI had been issued. However, it was after his resignation notice that the FDIC issued its ruling that the Bank was a troubled institution. It was also after he submitted his resignation that the FDIC notified the Bank it needed consent to make the payment. As a matter of law, Batten cannot recover against Edge for the fact that he did not receive the Severance Package.

After the ruling in its favor from the trial court, Bank filed a motion for attorneys' fees. The trial court granted the motion over Batten's objection and awarded Bank $294,965.18. In its memorandum opinion and order entered on October 27, 2017, the court held that because it granted Bank's summary judgment motion, "the Bank prevailed in this litigation" and was entitled to an award of its' reasonable attorney's fees pursuant to Paragraph 16 of the employment agreement. The court noted that the "case clearly involved a dispute about the Agreement. . . ." Batten then filed a timely notice of appeal.

## II. ISSUES

We restate the issues raised by Batten in this appeal as follows:

A. Whether it was error to grant the second motion for summary judgment filed by Edge and the motion for revision filed by Bank;

B. Whether it was error to limit and/or refuse Batten the opportunity to obtain information and documents pertaining to the communications among appellees and FDIC and/or

TDFI, the drafts of Batten's separation agreement prepared by Edge, and the circumstances and/or preparation of a financial institution letter by FDIC.

C. Whether it was error to grant the application for attorney's fees filed by Bank.

Bank's issues are restated as follows:

A. Whether the trial court correctly ruled that the condition of Batten's contract was unsatisfied.

B. Whether Batten demonstrated that the trial court abused its discretion with respect to any of the discovery rulings.

C. Whether Bank was the prevailing party and the trial court properly awarded Bank's attorneys' fees under the parties' contract.

Edge's issues are restated as follows:

A. Whether the appeal is barred by the law of the case doctrine.

B. Whether the trial court correctly held that Batten may not recover for negligent misrepresentation of a future fact.

C. Whether Batten can show that he reasonably or justifiably relied on anything that Edge told him, as Edge specifically told him to consult his own attorney.

D. Because Batten resigned due to his health, it does not matter what, if anything, Edge said to him about the agreement or the timing of his decision – nothing she said (or failed to say) caused his alleged harm because he had to resign.

E. Whether Batten may recover for Edge's failure to disclose information that was readily available to him.

### III.  STANDARD OF REVIEW

We review the trial court's findings of fact de novo upon the record.  Tenn. R.

App. P. 13(3). Those findings are presumed to be correct unless the evidence preponderates otherwise. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing Tenn. R. App. P. 13(d)). We review the trial court's conclusions of law de novo with no presumption of correctness. *McLarty v. Walker*, 307 S.W.3d 254, 257 (Tenn. Ct. App. 2009). We note that contract interpretation is a question of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).

In *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015), the Tennessee Supreme Court articulated the proper standard for summary judgment:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 W.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)). . . .

*Id.* at 250.

A trial court's decision regarding "discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated." *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992). An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

Our Tennessee Supreme Court has summarized the standard of review applicable to a trial court's decision regarding a reasonable attorney's fee as follows:

> [A] determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light

most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court . . . .

*Little v. City of Chattanooga*, No. E2013-00838-COA-R3-CV, 2014 WL 605430, at *3 (Tenn. Ct. App. Feb. 14, 2014) (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011)).

## IV. DISCUSSION

### "Golden Parachute"

Batten asserts that the severance benefits do not constitute a golden parachute payment because they fall squarely within one or more of the exceptions to the definition of a "golden parachute" contained in 12 C.F.R. § 359.1(f)(2)(ii), (iii) and (iv). If an exception is deemed applicable and the severance benefits are not a golden parachute, then there is no reason to seek approval under the provisions of 12 C.F.R. § 303.244.

The Federal Deposit Insurance Act ("the FDIA") authorizes FDIC to prescribe regulations pertaining to insured depository institutions. *See* 12 U.S.C. § 1828. Section 1828(k) empowers FDIC to prohibit certain payments by financial institutions to executive officers. The term "golden parachute payment" means "any payment to a senior executive officer for departure from a company for any reason, except for payments for services performed or benefits accrued." 12 U.S.C. § 5221(a)(2). FDIC's regulations define a "golden parachute payment" as follows:

(1)     The term golden parachute payment means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution holding company for the benefit of any current or former IAP [Institution-affiliated party] pursuant to an obligation of such institution or holding company that:

(i)  Is contingent on, or by its terms is payable on or after, the termination of such party's primary employment or affiliation with the institution or holding company; and

(ii)  Is received on or after, or is made in contemplation of, any of the following events:

(A) The insolvency (or similar event) of the insured depository institution which is making the payment or bankruptcy or insolvency (or similar event) of the

- 14 -

depository institution holding company which is making the payment; or

(B) The appointment of any conservator or receiver for such insured depository institution; or

(C) determination by the insured depository institutions or depository institution holding company's appropriate federal banking agency, respectively, that the insured depository institution or depository institution holding company is in a troubled condition, as defined in the applicable regulations of the appropriate federal banking agency (§ 303.101(c) of this chapter); or

(D) The insured depository institution is assigned a composite rating of 4 or 5 by the appropriate federal banking agency or informed in writing by the Corporation that it is rated a 4 or 5 under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council, or the depository institution holding company is assigned a composite rating of 4 or 5 or unsatisfactory by its appropriate federal banking agency; or

(E) The insured depository institution is subject to a proceeding to terminate or suspend deposit insurance for such institution; and

(iii) (A) Is payable to an IAP whose employment by or affiliation with an insured depository institution is terminated at a time when the insured depository institution by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii)(A) through (E) of this section, or in contemplation of any of these conditions; or

(B) Is payable to an IAP whose employment by or affiliation with an insured depository institution holding company is terminated at a time when the insured depository institution holding company by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in

- 15 -

paragraphs (f)(1)(ii)(A), (C) or (D) of this section, or
in contemplation of any of these conditions.

12 C.F.R. § 359.1(f)(1). The purpose of the golden parachute regulations is to "prevent[]
executives who have been terminated from troubled depository institutions from draining
money from those institutions." *Vaught v. Fed. Deposit Ins. Corp.*, No. 3:16-CV-507,
2018 WL 5098531 at *12 (E.D. Tenn. Apr. 4, 2018).

Several broad categories of payments that would otherwise fall under the
definition set forth in 12 C.F.R. § 359.1(f)(1) are listed as exceptions:

(2) Exceptions. The term golden parachute payment shall not include:

…
(ii) Any payment made pursuant to a benefit plan as that term
is defined in paragraph (c) of this section; or

(iii) Any payment made pursuant to a bona fide deferred
compensation plan or arrangement as defined in paragraph (d)
of this section; or

(iv) Any payment made by reason of death or by reason of
termination caused by the disability of an institution-affiliated
party.

12 C.F.R. § 359.1(f)(2). Batten asserts that the severance benefits under the employment
agreement fall within the enumerated exceptions to prohibited golden parachute
payments listed above. *See* sections 359.1(f)(2)(ii), (iii) and (iv). According to Batten,
questions of fact exist, relative to whether the three exceptions apply in this case, which
preclude the entry of summary judgment in favor of Bank.

**Employee Welfare Benefit Plan**

Batten claims that upon the execution of his employment agreement, Bank set up
an account ("the Deferred Compensation Account") into which funds were placed on a
monthly basis over the course of his employment for the purpose of facilitating the
payment of the severance benefits. According to Batten, Bank's financial records,
produced during discovery, confirm the existence of the account, as well as the fact that
Bank considered the funds contained therein to constitute deferred compensation. During
his deposition, a bank representative admitted that the Deferred Compensation Account
was carried as a liability on Bank's books and that, as of December 2009, the balance in

- 16 -

the account was in excess of $350,000.[9]  Batten therefore contends that the severance benefits are payable to him pursuant to an "employee welfare benefit plan" and do not constitute a golden parachute.

FDIC does not preclude severance benefits if they are paid pursuant to "any plan, contract, agreement or other arrangement which is an 'employee welfare benefit plan' as that term is defined in section 3(1) of the Employee Retirement Income Security Act ["ERISA"] of 1974, as amended (29 U.S.C. § 1002(1)), or other usual and customary plans such as dependent care, tuition reimbursement, group legal services or cafeteria plans. . . ." 12 C.F.R. § 359.1(f)(2)(ii).  29 U.S.C. § 1002(1) provides as follows:

> (1)  The terms "employee welfare benefit plan" . . . mean any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, . . . disability, . . . unemployment, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).  Batten notes that in *Caldwell v. PNC Financial Services Group, Inc.,* 835 F.Supp. 2d 510 (S.D. Ohio 2011), the court found as follows:

> Since 29 U.S.C. § 186(c) refers to severance benefits, the Sixth Circuit has held that severance plans are included in the definition of 29 U.S.C. § 1002(1)(B). *See Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1409 (6th Cir. 1996).  The Supreme Court has also held that "plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans." *Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 104 L.Ed. 2d 98 (1989).

*Caldwell*, 835 F.Supp.2d at 516.  Accordingly, Batten contends that  Bank's obligation to provide him the severance benefits falls squarely within the definition in 29 U.S.C. 1002(1).  *See DuBrul v. Citrosuco North America, Inc.*, 892 F.Supp.2d 892, 906 (S.D. Ohio 2012); *Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991); *Biggers v. Wittek Indus.,* 4 F.3d 291, 297 (4th Cir. 1993); *Evanoff v. Banner Mattress Co.,* 526 F.Supp.2d 810, 816 fn. 2 (N.D. Ohio 2007) (citing *B-T Dissolution, Inc. v. Provident Life and*

---

[9]At the time Batten resigned from Bank, there was in excess of $390,000 in the Deferred Compensation Account.

*Accident Ins. Co.*, 101 F.Supp. 2d 930, 940 n. 16 (S.D. Ohio 2000)).

Bank asserts that "[a]n employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan." *Kulinski v. Medtronic Bio-Medicus*, 21 F.3d 254, 256-57 (8th Cir. 1994). In order to determine whether a severance plan is an ERISA plan, the court "must look to the nature of the plan itself." *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 848 (6th Cir. 2006). Even though "an agreement to pay severance benefits may constitute an employee welfare benefit plan subject to ERISA's regulation," it is not one unless it satisfies other criteria. *Lettes v. Kinam Gold Inc.*, 3 F. App'x 783, 786 (10th Cir. 2001). An employee benefit program is regulated by ERISA only if it is administered through a "plan, fund, or program" established to provide benefits under any of the covered categories. *Sherrod v. Gen. Motors Corp.*, 33 F.3d 636, 638 (6th Cir. 1994). In determining whether a "plan, fund, or program" exists, a court should focus on whether the employee benefit requires an administrative scheme to execute. *Id.* The hallmark of an ERISA benefit plan is that it requires "'an ongoing administrative program to meet the employer's obligation.'" *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 517 (6th Cir. 1995) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S. Ct. 2211 (1987)). The factors employed by the Sixth Circuit to determine if a severance agreement plan meets the *Fort Halifax* criteria are: 1) whether the employer has discretion over the distribution of benefits; and 2) whether there are on-going demands on an employer's assets. *Kolkowski*, 448 F.3d at 848.

In regard to the first factor, employer discretion, a court considers whether the plan administrator made individualized determination of eligibility, as opposed to those that require automatic or simple decisions. *Id.* Simple or mechanical determinations regarding the distribution of benefits do not satisfy the first factor. *See Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 616 (6th Cir. 2002); *Nelson v. General Motors Corp.*, 156 F.3d 1231 (table), 1998 WL 415993 at *3 (6th Cir. July 7, 1998) (severance plan was not an ERISA plan where the amount of benefits was pre-determined through the collective bargaining process and employer did not exercise any discretion in executing the plan or determining the eligibility of employees to participate). However, "if to determine benefits the employer must "analyze each employee's particular circumstances in light of the appropriate criteria," the severance plan is probably an ERISA plan." *Cassidy*, 308 F.3d at 616 (quoting *Sherrod*, 33 F.3d at 639-39).

As to the second factor, whether benefits create ongoing demands on employer assets, a plan may be an ERISA plan if the employer "assumes . . . responsibility to pay benefits on a regular basis, and thus faces . . . periodic demands on its assets that create a need for financial coordination and control." *Fort Halifax*, 482 U.S. at 12, 107 S.Ct. 2211. While a one-time lump sum distribution of severance benefits is not consistent with an ERISA plan, *Sherrod*, 33 F.3d at 639, the Sixth Circuit has held that plans which permitted employees to choose between a lump sum payment and a continued salary over a period of time, *see Cassidy*, 308 F.3d at 616-17, or which provided for ongoing

medical, dental and life insurance benefits in addition to lump sum payment, *see Kolkowski*, 448 F.3d at 848, were sufficient to satisfy the second prong.

In *Kulinski*, the Eighth Circuit Court of Appeals found that an employer's severance packages for some of its executives were not "welfare benefit plans" because they were contingent upon a single event—termination or resignation of the executive—that did not require the employer to create an administrative scheme or make deliberate choices about eligibility. 21 F.3d at 257. "Because such a simple mechanical task" did not "require the establishment of an administrative scheme," the employer's "plan to provide golden parachutes for its executives was not" a "welfare benefit plan" under ERISA. *Id.*

In the matter before us, we do not find a separate, ongoing administrative scheme to administer benefits here. Thus, there is no ERISA plan in play. Batten was given unfettered discretion to resign. Bank's task was simple and mechanical. There was nothing for Bank "to decide, no discretion for it to exercise, and nothing for it to do but write a check." *Kolkowski*, 448 F.3d at 848. "Because such a simple mechanical task does not require the establishment of an administrative scheme," this was not an ERISA plan. *Id.*

Bank notes that ERISA would preempt the state law contract claim if the severance provision in the employment agreement created a "welfare benefit plan." Under 29 U.S.C. § 1144(a), ERISA supersedes "any and all state laws insofar as they may now or hereafter relate to an employee benefit plan." *Id.* The Sixth Circuit has noted that "virtually all state law claims relating to an employee benefit plan are preempted by ERISA." *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) (holding that plaintiffs' breach of contract claim for failure to pay plan benefits was preempted by ERISA). *See Lettes*, 3 F. App'x at 786 (confirming that "[c]ommon law tort and breach of contract claims are preempted by ERISA if the factual basis of the cause of action involves an employee benefit plan").

**Bona Fide Deferred Compensation Plan**

FDIC does not bar severance benefits if they are paid pursuant to a bona fide deferred compensation plan or arrangement defined as follows:

> (f)   Bona fide deferred compensation plan or arrangement means any plan, contract, agreement or other arrangement whereby:
>
> …
>
> (2)   An insured depository institution or depository institution holding company establishes a nonqualified

- 19 -

deferred compensation or supplemental retirement plan, other than an elective deferral plan described in paragraph (e)(1) of this section:

…

(iii)    Primarily for the purpose of providing supplemental retirement benefits or other deferred compensation for a select group of directors, management or highly compensated employees (excluding severance payments described in paragraph (f)(2)(v) of this section and permissible golden parachute payments described in § 359.4); and

12 C.F.R. 359.1(f)(2)(iii).

Batten claims that if the severance benefits did not constitute part of an employee welfare benefit plan, they would nevertheless satisfy FDIC's definition of a bona fide deferred compensation plan. He contends that upon the execution of the employment agreement, Bank established the Deferred Compensation Account, and began contributing to that account for the purpose of setting aside funds necessary to pay the supplemental retirement benefits that would be payable to Batten upon his resignation. Additionally, he submits that the severance benefits satisfy the wording of subsection (2)(iii), as these benefits were payable only to Batten and were clearly intended to constitute deferred compensation and supplemental retirement benefits.[10] According to Batten, the primary purpose of Section 4 of the employment agreement was to provide additional deferred compensation and benefits to him upon his termination.

12 C.F.R. § 359.1(d)(3) requires certain additional factors to be met for the exception set forth in 12 C.F.R. § 359.1(f)(2)(iii) to apply:

(3)   In the case of any nonqualified deferred compensation or supplemental retirement plans as described in paragraphs (d)(1) and (2) of this section, the following requirements shall apply:

(i)  The plan was in effect at least one year prior to any of the events described in paragraph (f)(1)(ii) of this section;

(ii)  Any payment made pursuant to such plan is made in accordance with the terms of the plan as in effect no later than one year prior to any of the events described in paragraph

---

[10]Lower level employees of Bank did not have employment agreements that provided benefits similar to the severance benefits contained in Batten's contract.

(f)(1)(ii) of this section and in accordance with any amendments to such plan during such one year period that do not increase the benefits payable thereunder;

(iii)   The IAP has a vested right, as defined under the applicable plan document, at the time of termination of employment to payments under such plan;

(iv)  Benefits under such plan are accrued each period only for current or prior service rendered to the employer (except that an allowance may be made for service with a predecessor employer);

(v)  Any payment made pursuant to such plan is not based on any discretionary acceleration of vesting or accrual of benefits which occurs at any time later than one year prior to any of the events described in paragraph (f)(1)(ii) of this section;

(vi)   The insured depository institution or depository institution holding company has previously recognized compensation expense and accrued a liability for the benefit payments according to GAAP[11] or segregated or otherwise set aside assets in a trust which may only be used to pay plan benefits, except that the assets of such trust may be available to satisfy claims of the institution's or holding company's creditors in the case of insolvency; and

(vii)  Payments pursuant to such plans shall not be in excess of the accrued liability computed in accordance with GAAP.

12 C.F.R. § 359.1(d)(3).

Batten asserts that all of the foregoing factors have been satisfied:   The employment agreement was in place for over one year and its terms were not changed within a year prior to Batten's resignation; upon his resignation, Batten had a vested right to receive his severance benefits; Bank accrued an increasing liability, and contributed to the Deferred Compensation Account, on a month to month basis, depending on Batten's continued employment; and there is no provision in the employment agreement contemplating accelerating of vesting.  In regard to subsection (vii), Batten contends that had Bank continued to contribute to the Deferred Compensation Account instead of

---

[11]Generally Accepted Accounting Principles.

zeroing out the account and taking a credit on its books, there would have been sufficient funds in the account to pay the severance benefits over the thirty-six month period following his resignation. Accordingly, Batten argues that the severance benefits owed to him fall within the exception to golden parachute payments contained in 12 C.F.R. § 359.1(f)(2)(iii).

Bank asked for FDIC's guidance after Batten's complaint, and FDIC responded with a five-page letter explaining in detail why Batten's severance package was an impermissible golden parachute. All of the requirements of FDIC's regulations were met—Bank was in a "troubled condition" pursuant to the regulations, Batten was an "institution-affiliated party" covered by the regulations, and the severance payment was due after Batten's termination as required by the regulations. After reviewing the alleged "plan"—the four-sentence paragraph in Batten's contract entitled "Payments to Batten Upon Termination"—FDIC determined that it did not qualify as a "bona fide deferred compensation plan" under the regulation:

> Based on the information provided [by the Bank], the payments to Mr. Batten pursuant to the Employment Agreement do not appear to fit any type of [deferred compensation] plan described in the regulation. First, it does not appear that Mr. Batten voluntarily elected to defer any compensation paid for services rendered which were not otherwise payable during the course of his employment. Second, Section 4 of the Employment Agreement does not appear to be a plan established primarily for the purpose of providing benefits for certain [officers and directors] in excess of the limits imposed by the Internal Revenue Code. Third, the payments to Mr. Batten do not appear payable pursuant to a plan established primarily for the purpose of providing supplemental retirement benefits for a select group of directors, management or highly compensated employees. . . . Based on the foregoing and absent any further evidence to the contrary, the payments to Mr. Batten pursuant to the Employment Agreement are not payments made pursuant to a bona fide deferred compensation plan or arrangement as defined in Part 359.1(d).[12]

Bank notes that Batten offers only conclusory, uncited single sentences for six of

_____

[12]Batten argues that the findings contained in FDIC letter were based upon FDIC's preliminary review of the employment agreement and limited information that it received from Bank. He contends that Bank failed to provide FDIC with substantial pertinent evidence. He asserts that FDIC's analysis relative to 12 C.F.R. § 359.1(f)(iii) contains material errors.

the seven factors he lists with no explanation for how the factors are satisfied. For example, Batten claims without explanation or citation that he "had a vested right to receive his" severance pay when he resigned. He fails to acknowledge, Bank claims, that his severance pay was contingent upon termination without cause, and he does not cite any authority that would make such a severance payment "vested" despite its contingent nature. Therefore, Bank declares the severance payment was not guaranteed money that was due Batten under any circumstances and was therefore not a "vested" benefit.

As to the requirement that a bank accrue a liability for the payment according to GAAP, 12 C.F.R. § 359.1(d)(3)(iv), Bank admits that it did accrue a liability for a potential severance payment to Batten during his employment. Bank argues, however, that the severance payment failed to meet the deferred compensation exception under the regulation according to FDIC. Despite a bank recognizing a payment as a liability, the payment must still meet one of the primary requirements in Section 359.1(d) in order to fall under an exception. According to Bank, it never established a bona fide deferred compensation plan or arrangement for Batten as that term is defined in 12 C.F.R. § 359.1(d). Thus, although it accrued the potential termination payments to account for a contingent liability, it was not as part of any deferred compensation program as defined in 12 C.F.R. § 359.1(d).

In *Vaught v. Green Bankshares, Inc.*, No. E2015-01259-COA-R3-CV, 2016 WL 1594963 (Tenn. Ct. App. Apr. 18, 2016), a bank and a former bank officer differed over a severance payment. FDIC opined that the payment ordered by the trial court constituted an impermissible golden parachute. *Vaught*, 2016 WL 1594963 at *5. This court found that FDIC's opinion that the severance payment was a golden parachute warranted deference. *Id.* at *12. The court had only to decide "whether the agency's interpretation is plainly erroneous or inconsistent with the regulations, or, whether the interpretation reflects the agency's fairly considered judgment." *Id.* As noted by Bank, the positions of the plaintiff in *Vaught* incorporated "accounting principles, trial testimony, and the time value of his deferred compensation" that the court conceded was "not illogical." The *Vaught* court observed, however, that what mattered was whether "FDIC's interpretation of the regulations" was "a reasonable one." *Id.* at *12.

When a government agency has interpreted and applied its regulations as FDIC did in this case, a litigant must demonstrate to the court that the agency's interpretation of its regulations is "plainly erroneous or inconsistent with the regulation" or there is any other "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, 561, 462, 117 S. Ct. 905 (1997). If he cannot do so, the court must give "great deference and controlling weight to [the] agency's interpretation of its own rules and regulations, except where the interpretation is plainly erroneous or inconsistent with the regulation itself." *Byrd v. Tenn. Bd. of Chiropractic Exam'rs*, No. M2010-01473-COA-R3-CV, 2011 WL 3558166 (Tenn. Ct. App. Aug. 11, 2011) at *8. Because Batten has not proven that the

payment in this case meets the primary requirements of the statute—all of which FDIC ruled out in its letter—or other requirements such as vesting, he has not proven that FDIC's conclusion was "plainly erroneous."

## Disability

Section 5 of Batten's employment agreement provided for payments in the event of his termination because of disability. Under that clause, Batten would have had to be "disabled for more than six (6) consecutive months" per Bank's disability policy (or per federal law) before he could be eligible for severance payments due to him by reason of his disability. Such payments would have been limited in time to the period following his termination before he obtained another full-time job, which occurred only months after he resigned. 12 C.F.R. § 359.1(f)(2)(iv) specifically provides that a prohibited golden parachute payment does not include, "[a]ny payment made by reason of death or by reason of termination caused by the disability of an institution-affiliated party." Neither party has argued that Batten or Bank proceeded under this provision, nor is there any evidence to indicate that this occurred. Batten, however, now argues that the exception is applicable to the severance benefits and prevents summary judgment in favor of Bank on his claims, as his termination resulted due to his medical disability. According to Batten, Bank acknowledged the fact that he terminated his employment due to medical disability when, on December 24, 2009, it sent a letter to all of its shareholders noting that his resignation had been tendered citing health reasons. Because his resignation was necessitated by his deteriorating health and inability to continue to perform his job duties, Batten argues that he became entitled to receive payments "by . . . reason of termination caused by the disability of an institution–affiliated party." *See* 12 C.F.R. § 359.1(f)(2)(iv).

Batten made no application for either short-term or long-term disability benefits during the 60-day notice period following his submission of his notice of termination. Further, he never submitted any affidavit or other proof from any medical authority indicating that he is disabled in any way. Moreover, the severance benefits were to be paid in only one of two circumstances: (1) if Batten voluntarily resigned upon sixty days' notice; or (2) if Bank fired Batten on sixty days' notice for a reason other than cause. Thus, the payments were not contingent upon Batten's "disability," and his claims that he resigned because of his health are not a factor to be considered under the contract and the facts before us.

## Bad Faith

Once FDIC has decided that a severance payment is a golden parachute, a bank cannot make the payment without permission from FDIC. In order to possibly obtain that permission, the bank must be able to certify "that there is no reasonable basis to believe

that the" former executive seeking the golden parachute "is substantially responsible for the bank's troubled condition." *Mt. Heritage Bank v. Rogers*, 728 S.E.2d 914, 917 (Ga. Ct. App. 2012).

In the event that none of the other enumerated exceptions set forth in 12 C.F.R. § 359.1(f)(2) apply to a payment that falls within the definition of a golden parachute, section 359.1(f)(2) contains an additional catchall exception, which allows a bank to submit a request to the FDIC for permission to make such a golden parachute payment. *See* 12 C.F.R. § 359.1(f)(2)(vii) (this section carves out an exception for "[a]ny other payment which the [FDIC] determines to be permissible in accordance with § 359.4").

12 C.F.R. § 359.4 provides, in pertinent part, as follows:

§ 359.4 Permissible golden parachute payments:

> (a)     An insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that:

> (1)     The appropriate federal banking agency, with the written concurrence of the Corporation, determines that such a payment or agreement is permissible; or …

(4) An insured depository institution, depository institution holding company or IAP making a request pursuant to paragraphs (a)(1) through (3) of this section shall demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that:

> (i) The IAP has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or depository institution holding company that has had or is likely to have a material adverse effect on the institution or holding company;

> (ii)  The IAP is substantially responsible for the insolvency of, the appointment of a conservator or receiver for, or the troubled condition, as defined by applicable regulations of the appropriate federal banking agency, of the insured depository institution, depository institution holding company or any insured depository institution subsidiary of such holding

- 25 -

company;

(iii) The IAP has materially violated any applicable federal or state banking law or regulation that has had or is likely to have a material effect on the insured depository institution or depository institution holding company; and

(iv) The IAP has violated or conspired to violate section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of title 18 of the United States Code, or section 1341 or 1343 of such title affecting a federally insured financial institution as defined in title 18 of the United States Code.

(b) In making a determination under paragraphs (a)(1) through (3) of this section, the appropriate federal banking agency and the Corporation may consider:

(1) Whether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility;

(2) The length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and

(3) Any other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the Act or this part.

12 C.F.R. § 359.4. Bank sought permission from FDIC, pursuant to 12 C.F.R. § 303.244 and 12 C.F.R. § 359.4(a)(4), to pay the severance benefits to Batten, but FDIC refused to allow it to do so.

Batten asserts that he did not act dishonestly or incompetently. He claims that he did not willfully violate any laws, rules, or regulations that materially and negatively affected Bank. He argues that the extra work he performed substantially benefitted Bank and did not impair or impact his performance of other job duties. He asserts that the Board of Directors was aware of all his activities and expressed no objections. Batten notes that on December 7, 2009, Edge stated in a letter to TDFI that Bank's asset quality and general downturn was due to "circumstances beyond our control, including the deteriorating financial position of one of our principal shareholders. . . . ," "a compressed net interest margin," "increased provisional expenses," and "losses associated with the

- 26 -

failure of Silverton Bank, N.A. . . .” In fact, according to Batten, by December 2009, Bank's assets were improving; core earnings were improving; Bank's adversely classified assets to capital ratio had dropped from 105.05% to 87.05%; Bank was in the process reducing the adversely classified assets to 79.14%; and Bank was facilitating a large injection of capital, which would result in Bank achieving “well capitalized” status. Thus, Batten asserts that Bank intentionally submitted an incomplete section 359.4 request hoping to generate a rejection letter from FDIC to lend credence to its argument that Batten had mismanaged Bank. He contends that Bank's request was not denied on the merits but simply deemed “abandoned” by FDIC. He argues that Bank did not engage in a good faith effort to obtain permission to pay him.

Bank argues that Batten, to successfully demonstrate that Bank failed to comply with the law when it sought permission to pay him, had to show that Bank had no “reasonable basis” to not declare him totally free of responsibility for Bank's troubled condition. Under the regulations, Bank contends that it is only required to demonstrate that it has information providing a reasonable basis to believe that Batten was responsible for its troubled condition, thereby rendering it unable to make the required certification. *See Clark v. Carver Fed. Sav. Bank*, 297 A.D.2d 599 (N.Y. App. Div. 2002) (holding that bank is not required to demonstrate conclusively that plaintiff was actually responsible for its troubled condition to be relieved of obligation to pay severance benefits); *Von Rohr v. Reliance Bank*, No. 4:13-CV-232, 2015 WL 3440343, at *4 (E.D. Mo. May 28, 2015). Bank asserts its request lacked the certification of Batten's innocence because it had reason to believe that Batten indeed contributed to its problems, not because it was acting in “bad faith.” According to Bank, it had more than a “reasonable basis” to suspect that Batten played a role in its troubled condition. Batten, on the other hand, has presented no evidence to counter that fact but contends bad faith via conclusory, unsupported accusations.

The condition here -- the approval by FDIC -- is imposed by regulatory mandate. *See* 12 C.F.R. § 359.2; § 359.4(a)(1). The parties had no choice but to submit to the golden parachute regulations and to obtain FDIC's authorization. The evidence does not support Batten's claims that Bank did not act in good faith. He has not established that Bank was being untruthful in declaring that it could not make the required certification. Bank is prevented by law from paying unless and until FDIC determines that the payment is permissible. *Von Rohr*, 2015 WL 3440343, at *4. Bank's performance was excused under the doctrine of legal impossibility, as performance was rendered objectively impossible by the operation of law (refusal of FDIC to approve payment). *See Rosenberger v. United Community Bancshares, Inc.,* 73 N.E.3d 642, 649 (Ill. Ct. App. 2017).

### Conditions Precedent

Bank further argues that it is excused from paying Batten's severance benefits

because conditions precedent contained in the employment agreement were not satisfied. Contract interpretation is a matter of law, which requires we conduct a de novo review with no presumption of correctness awarded to the trial court's interpretation. Tenn. R. App. P. 13(d); *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014).

Bank specifically relies on Section 19 of the employment agreement:

> **19. CONTINUATION OF AGREEMENT.** Subject to the provisions of Section 18 of the Agreement, it is understood that the continuation of the maintenance of this Agreement is conditioned upon the continuation of the Charter for the Bank ***and the continued regulatory approval of the operations of the Bank***.

(Emphasis added.) Bank urges that the term "regulatory approval" required that, at all times during Batten's employment, regulatory agencies such as TDFI and FDIC be completely and totally satisfied with all actions taken by any employee of Bank. According to Bank, the satisfaction of regulatory agencies with all aspects of Bank's operations constitutes a condition precedent to Bank's performance of its obligations to Batten under the employment agreement. Bank contends that after the examination by TDFI in 2009, both TDFI and FDIC became dissatisfied with certain aspects of Bank's condition, and that dissatisfaction excused Bank from performing under the employment agreement and paying the severance benefits.

Batten responds that all conditions precedent contained in the employment agreement relative to the payment of the severance benefits have been met. According to Batten, Section 4 contains the only condition precedent that he was required to satisfy to be entitled to receive *his* severance benefits in the event that he terminated his employment with Bank--provide Bank with sixty days prior written notice of his termination. He contends that because Bank continued operations as a financial institution with the approval of applicable regulatory agencies, the terms of Section 19 of the employment agreement were satisfied. Batten argues that unless Bank ceased doing business as a financial institution, and the very purpose of his employment was frustrated, the employment agreement would remain enforceable. He argues that Bank has attempted to alter the terms of the employment agreement by asserting an ambiguity exists in Section 19. Bank contends that it has never asserted that any governing language in the employment agreement is ambiguous.

"A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). The parties' intent is determined by considering the "plain meaning of the words" used in the contract. *Id.* If the words used are clear, unambiguous, and not susceptible to more than one reasonable interpretation, courts are to rely on the literal language used in the

contract to determine the parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (explaining parties' intent is based on usual, natural, and ordinary meaning of words used in contract. As noted in *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008), "[t]he interpretation [of a contract] should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." A court will not look beyond the four corners of the document to determine the parties' intent when the contract is unambiguous. *Williams v. Larry Stoves and Lincoln Mercury, Inc.*, No. M2014-00004-COA-R3-CV, 2014 WL 5308634, at *4 (Tenn. Ct. App. Oct. 15, 2014).

An ambiguity "does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. Rather, a contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (internal quotation marks and citations omitted). *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

The approval of the regulatory agencies was required under this employment agreement. Clearly, the facts before us establish that the state and federal agencies tasked with regulating Bank disapproved of its operations. As argued by Bank, "the existence of the contract was 'conditioned upon . . . regulatory approval of the operations of the Bank,'" and TDFI's and FDIC's disapproval "effectively ended the Bank's responsibilities to Batten." Accordingly, Batten did not meet the conditions precedent in the employment agreement and is not entitled to any severance pay.

## Discovery Issues

Rule 26.02(1) of the Tennessee Rules of Civil Procedure provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including . . . the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection, that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Tenn. R. Civ. P. 26.02(1). Discovery rules are accorded broad and liberal treatment, for

mutual knowledge of all the relevant facts gathered by all parties is essential to proper litigation. *Hickman v. Taylor*, 323 U.S. 495, 50, 67 S. Ct. 385 (1947). In *White v. Vanderbilt University*, 21 S.W.3d 215 (Tenn. Ct. App. 1999), we noted:

> The first, and perhaps more important, policy is that discovery should enable the parties and the courts to seek the truth so that disputes will be decided by facts rather than by legal maneuvering. The second policy is that the discovery rules should not permit less diligent lawyers to benefit from the work of their more diligent opponents.

*Id.* at 223 (citations omitted).

Batten argues that the trial court erred in refusing to allow and/or limiting his ability to conduct discovery. He claims that the trial court did not allow him to obtain information and documents pertaining to the communications among the appellees and FDIC and TDFI, the drafts of Batten's separation agreement prepared by Edge, and the circumstances and/or preparation of a financial institution letter by FDIC. He further argues that the trial court failed to allow him to pursue any administrative remedies and/or relief in federal court. Batten asserts that the court should have ordered a stay to allow him to file a lawsuit against FDIC under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. *See Vaught*, 2016 WL1594963, at *12.

Bank contends that Batten has not demonstrated the trial court abused its discretion with respect to any of the discovery rulings. He provided a chart listing over a dozen motions, briefs, and orders that related to various discovery issues with dates and locations within the record. However, as noted by Bank, he did not identify any errors in any specific court orders, did not explain why any alleged error constituted an abuse of discretion, did not discuss any case law, rule, or statute that supports his position on any specific alleged error, and, did not ask the court for any form of remedy. By not analyzing, discussing, or identifying the alleged errors committed by the trial court, Batten has not met his burden under the abuse of discretion standard.

As with his discovery arguments, Batten did not cite to an order in which the trial court "failed" to allow him to pursue FDIC. He cites to no act by the trial court that limited his ability to sue FDIC or administratively challenge it on the golden parachute issue. Furthermore, he fails to acknowledge that in 2010, the trial court did give him the opportunity to depose an FDIC representative. In 2011, the court stayed the parties' case to give both Batten and Bank the chance to ask FDIC to determine whether he could receive severance pay. Batten did neither. He has not subpoenaed or deposed any FDIC agent in this litigation, nor has he challenged the agency's application of the golden parachute regulation administratively or in a lawsuit. We find no abuse of discretion by

the trial court.[13]

## Edge Issues

Batten argues that it was error to grant the second motion for summary judgment filed by Edge. He contends that the trial court, with Judge Bolton presiding, denied Edge's first motion for summary judgment upon holding that there were genuine issues of material fact pertaining to "whether Ms. Edge had knowledge of the Bank's condition at the time she spoke with Plaintiff about Plaintiff's decision to resign" and "the content of what Ms. Edge did or did not disclose to Plaintiff about the Bank's condition." Batten argues that Edge's second motion for summary judgment was worded exactly the same as the first one and contained no new authority. It had only "additional argument to address the plaintiff's claim, as well as with argument to distinguish authorities cited by the plaintiff to avoid summary judgment." As the second trial judge reached a determination inconsistent with the first, Batten asserts that these findings reflect that questions of material fact preclude a grant of summary judgment. Further, Batten contends that our refusal to extend interlocutory review to the denial of Edge's first motion for summary judgment resulted in it being decided by implication, thus precluding the grant of the second motion pursuant to the law of the case doctrine.

Edge asserts that before the court can apply the law of the case, there must be a law of the case, i.e., a previous case on appeal. In the present matter, she asserts that by virtue of this court's denial of the application, there was no previous appeal.

## "Law of the Case Doctrine"

In *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board*, 975 S.W.2d 303, 306 (Tenn. 1998), our Supreme Court observed:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. 5 Am. Jur.2d *Appellate Review* § 605 (1995). In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. *Life & Casualty Ins. Co. v. Jett*, 175 Tenn. 295, 299, 133 S.W.2d 997, 998-99 (1939); *Ladd v. Honda Motor Co., Ltd,* 939 S.W.2d 83, 90

---

[13] We likewise find that Batten has not established any abuses of discretion by the trial court in its evidentiary rulings.

- 31 -

(Tenn. Ct. App. 1996). The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. *Ladd*, 939 S.W.2d at 90 (citing other authority).

The doctrine is not constitutionally mandated and is not a limitation on the court's power, but "it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* (citing *Ladd*, 939 S.W.2d at 90). The purpose of the rule is to promote "the finality and efficiency of the judicial process, avoid[] indefinite relitigation of the same issue, foster[] consistent results in the same litigation, and assure[] the obedience of lower courts to the decisions of appellate courts." *Id.*

As the Supreme Court noted, the doctrine requires a "first appeal"; in the present case, there was no "first appeal" because we declined to hear the case. In our denial of Edge's application, we found "that this is not an appropriate case in which to grant interlocutory review." The only issues which the court decided were whether interlocutory appeal was necessary (1) "to prevent irreparable injury"; (2) "to prevent needless, expensive, and protracted litigation"; or (3) "to develop a uniform body of law." Nowhere did we preclude ultimate resolution of the merits of the case or state that the trial court was precluded from entering summary judgment. Without deciding an issue on appeal, without an actual appeal, the law of the case does not apply.

In our view, the trial court was authorized to hear and grant Edge's (and Bank's) second summary judgment motion. As the summary judgment standard changed in the interim between the motions, we conclude that the trial court did not abuse its discretion in re-hearing the dispositive motions.[14] The trial court is in the best position to make such a determination. *See Henry v. Goins*, 104 S.W.3d 475, 482 (Tenn. 2003).

We further find that Batten has waived this argument. In response to Edge's second motion for summary judgment, Batten never argued that the motion was barred by the law of the case doctrine. *Powell v. Cmty. Health Sys., Inc.,* 312 S.W.3d 496, 511 (Tenn. 2010) ("It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court.").

### Negligent Misrepresentation

According to Batten, prior to tendering his notice of resignation to Bank, he

---

[14] Under a related Rule 59.04 situation, we noted that a motion to alter or amend should be granted when the controlling law changes before the judgment becomes final. *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005).

specifically asked Edge if she was aware of any reason why he might not receive his severance benefits if he followed her advice and immediately tendered his resignation. Batten claims that Edge represented to him that she was not aware of anything that would affect his ability to receive his benefits if he immediately tendered his resignation to Bank in December 2009. Batten contends that Edge's representations to him were faulty. The misrepresentations about which he now complains are that he needed to terminate his employment immediately and that she was not aware of anything that would affect his ability to receive the severance benefits if he tendered his resignation at that time. Batten notes that Judge Bolton specifically held that some of the material facts in dispute were: "whether Ms. Edge had knowledge of the Bank's condition at the time she spoke with Plaintiff about Plaintiff's decision to resign" and "the content of what Ms. Edge did or did not disclose to Plaintiff about the Bank's condition." Batten asserts that Edge's awareness of matters regarding Bank that placed Batten's severance benefits at risk constitutes an existing fact. He claims that she assumed a duty to advise him what was in his best interests and that she negligently performed this duty.

In October, November, and December of 2009, Edge had engaged in numerous communications with representatives of TDFI regarding the findings and regulatory action TDFI might take against Bank. According to Batten, in December 2009, Edge was well aware of the following: (1) the nature of Bank's financial condition; and (2) that TDFI's examiners had recommended or assigned Bank a CAMELS composite score of 4. Thus, he asserts that contrary to what she represented to him in December 2009, Edge was aware of existing facts and circumstances that placed his severance benefits in substantial jeopardy if he terminated his employment in December 2009. Due to Bank's financial condition and the findings and recommendations of TDFI's bank examiners, a risk existed that Batten's severance benefits would be considered a prohibited golden parachute. According to Batten, the risks that Edge represented to him did not exist, did, in actuality, exist in December 2009, and he relied upon her representation. The timing of Batten's resignation created this risk, because he terminated his employment when Bank was purportedly in a troubled condition, and his severance benefits were due to be paid when Bank was in a troubled condition. *See* 12 C.F.R. § 359.1(f)(1). Batten argues that if he had been told to wait a matter of months, Bank would have had no basis to argue that his severance benefits constituted a prohibited golden parachute. Batten acknowledges that he was aware of the results of TDFI's review of Bank, but he claims no understanding, knowledge, or expertise relative to the federal laws, rules, and regulations governing golden parachute matters.

Edge contends that prior to Batten resigning from Bank on December 21, 2009, she warned him on December 17, 2009, that he "may want to consult [his] own counsel about this, as well, as we discussed." She argues that by advising him to seek counsel, Batten lacks any conceivable argument that he reasonably relied on an alleged representation from her, as she was not his attorney and was acting in her capacity as

- 33 -

counsel for Bank.[15]  Batten responds that Edge assumed a duty to him when she consulted with him about the resignation and helped him draft the notice.

Edge admits that as early as October 8, 2009, she was aware that Bank's composite CAMELS score was a "4" and that, in her experience, she had not encountered a situation where FDIC has taken a contrary position to TDFI relative to the condition of a bank.  She does not contend that, in December 2009, she was unaware of the risk that, if Batten terminated his employment in December 2009, his severance benefits might be determined to constitute a prohibited golden parachute payment.  Instead, Edge argues that Batten's claim is based on a misrepresentation of a future fact.  She asserts that a negligent misrepresentation claim requires a plaintiff to prove a misrepresentation of a present or existing fact.  According to Edge, Batten does not claim that she misstated any present or existing fact; rather, he alleges that had she advised him differently, he might have received his golden parachute at some point in the future.

As noted by Batten, in *Robinson v. Omer*, 952 S.W.2d 423 (Tenn. 1997), the Tennessee Supreme Court discussed the essential elements of a negligent misrepresentation claim:

> Tennessee has adopted Section 552 of the Restatement (Second) of Torts "as the guiding principle in negligent misrepresentation actions against other professionals and business persons." *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991).  Section 552 provides, in pertinent part, as follows:
>
> (1)    One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2)    Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a)    by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it;

---

[15] She represented Bank from November 2, 2009, until February 2010, at which time she was made a defendant in the proceedings instituted by Batten.

and

> (b)    through reliance upon it in a transaction that he intends
> the information to influence or knows that the recipient so
> intends or in a substantially similar transaction.  Restatement
> (Second) of Torts, § 552 (1977).

*Robinson*, 952 S.W.2d at 427.  In discussing the requirements for recovery under Section 552, our Supreme Court has provided

> that liability in tort will result, despite the lack of contractual
> privity between the plaintiff and defendant, when:
>
> (1)    the defendant is acting in the course of his business,
> profession, or employment, or in a transaction in which he
> has a pecuniary (as opposed to gratuitous) interest; *and*
>
> (2)    the defendant supplies faulty information meant to
> guide others in their business transactions; *and*
>
> (3)    the defendant fails to exercise reasonable care in
> obtaining or communicating the information; *and*
>
> (4)    the plaintiff justifiably relies upon the information.

*Id.* (emphasis added); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991); accord *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 130 (Tenn. 1995).  Section 552 is the most widely adopted standard of negligent misrepresentation in attorney liability cases and economic negligence cases generally.  *See* Jay M. Feinman, "Attorney Liability to Nonclients," 31 *Tort & Ins. L.J.* 735, 742 (1996).  The Tennessee Supreme Court has recognized that an attorney may be liable for misrepresentations absent any attorney-client relationship. *See Collins v. Binkley*, 750 S.W.2d 737, 739 (Tenn. 1988); *Stinson v. Brand*, 738 S.W.2d 186, 190 (Tenn. 1987).

### Existing Facts/Future Events

Batten asserts that he asked Edge whether there was any legal authority that would affect his ability to receive the severance package.  It appears that at the time the parties spoke, Edge was aware of existing facts such as Bank's composite score and TDIF's review of Bank, that, when viewed in the light of her experience with banks in similar situations, made her cognizant of the fact that Batten's severance package was at risk.  Comment b to the Restatement specifically states that it "applies not only to information

given as to the existence of facts but also to an opinion given upon facts equally well known to both the supplier and the recipient." Restatement (Second) of Torts § 552, cmt. b. Comment e to the Restatement provides that "[w]hen the information consists of an opinion upon facts . . . otherwise known to [plaintiff], the recipient is entitled to expect a careful consideration of the facts and competence in arriving at an intelligent judgment." *Id.,* § 552, cmt. e. In *International Market and Restaurant, Inc. v. Belmont University,* No. M2010-00005-COA-R3-CV, 2010 WL 4514980, at *3 (Tenn. Ct. App. Nov. 9, 2010), we held that the plaintiff could not recover for an alleged misrepresentation of a future fact:

> Tennessee courts require that the false information consists of statements of a material past or present fact. ***Consequently, the tort of negligent misrepresentation cannot be based on statements of opinion or representations of future events.***

(Internal citations omitted) (emphasis added). The court observed in a footnote that a misrepresentation about a future event <u>can</u> be the basis of a negligent misrepresentation claim if the misrepresentation about the future event is based on a present fact. *Id.* (citing *Cummins v. Opryland Prods.,* No. M1998-00934-COA-R3-CV, 2001 WL 219696, at *8 (Tenn. Ct. App. Mar. 7, 2001); *Glanton v. Beckley,* No. 01-A-01-9606-CV-00283, 1996 WL 709373, at *9 (Tenn. Ct. App. Dec. 11, 1996) (emphasis added). As noted in *Cummins,* "Tennessee courts require that the false information consist of statements of a material past or present fact. [T]he tort of negligent misrepresentation cannot be based on conjecture, statements of opinion, puffing and sales talk, or representations of future events." 2001 WL 219696, at *8 (internal citations omitted). However, the court, quoting *Glanton,* stated that "representations concerning . . . existing agreements involve a present or past fact and, therefore, support a claim for negligent misrepresentation." 1996 WL 709373, at *9. Under the specific facts in *Cummins,* the court noted:

> While the alleged statements concerning the anticipated guarantee of payment and the viability of the deal involved future events, they were based at least in part on the alleged present fact that the people . . . had already committed funds to the project. The representations concerning the partial payment involve a present or past fact and, therefore, are sufficient to support a claim for negligent misrepresentation.

2001 WL 219696, at *9.

Taking Batten's allegations as true with all reasonable inferences in his favor, Edge's alleged statement that she was not aware of anything that would affect Batten's ability to receive the severance package appears to be an unsupported conclusion based on the existing facts known to her: the already negotiated severance contract, Bank's

current financial and regulatory situation, and Edge's professional experience with banks in similar situations.

## Intention/Reliance

"Under the tort of negligent misrepresentation, liability is not based on the breach of duty a professional owes his or her clients or others in privity, but on an independent duty to the nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely." *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999) (citing *Horizon Fin., F.A. v. Hansen*, 791 F.2d 770 (3d Cir. 1985) and *Robert & Co. Assocs. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 300 S.E.2d 503 (1983)). In *John Martin Co.,* our Supreme Court noted that we have been careful to limit liability to only those whose use of the information is reasonably foreseeable:

> By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests.

*Id.,* 819 S.W.2d at 431.

Under section 552(2) of the Restatement, liability is limited to loss suffered: "by the person . . . for whose benefit and guidance [one] intends to supply the information . . . and (b) . . . in a transaction that [one] intends the information to influence . . . ." Thus, liability is limited "to situations in which the attorney who provides the information . . . intends that the nonclient rely on the information." *McCamish*, 991 S.W.2d at 794; *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 920 (Tex. 2010). "Unless a plaintiff falls within this scope of liability, a defendant cannot be found liable for negligent misrepresentation." *McCamish*, 991 S.W.2d at 794.

The record reveals that Edge did not intend for Batten to rely on their conversations. In our view, Batten was clearly aware of the extent to which his interests and those of Edge's actual client, Bank, were, at that time, inconsistent with each other. *Id.* (citing Feinman, 31 *Tort & Ins. L.J.* at 750). She informed him verbally and in writing to consult his own counsel. Edge did not have exclusive access or control over the relevant information, and Batten has not demonstrated that he "made a reasonable inquiry into the representation, that he was denied the opportunity to investigate, or that he could not have learned the true facts through reasonable diligence." *Rountree v.*

*Chowan Cnty*, 796 S.E.2d 827, 832 (N.C. App. 2017). Although we have previously recognized that the reasonableness of an alleged misrepresentation is generally a question of fact inappropriate for summary judgment, we find that, given Batten's banking knowledge, his appreciation of the facts and circumstances at the time of the events at issue, and the amount of money involved, a sophisticated professional like Batten would not have justifiably relied on the conversation with Edge.

## Business Transaction/Pecuniary Interest

In *Robinson*, the infirmity in the third-party's claim identified by the Court was that the advice did not involve a business transaction. 952 S.W.2d at 428. The *Robinson* Court observed as follows:

> [I]n the non-lawyer cases involving application of Section 552, recovery has been allowed *only when the advice or information negligently supplied was given in the course of a commercial or business transaction for guidance of others in their business transactions*. *See, e.g., Bethlehem Steel Corp.*, 822 S.W.2d at 592 (national accounting firm which negligently prepared an audit report regarding customer of manufacturer held liable to manufacturer which relied upon the audit report to its detriment in extending credit to customer); *John Martin Co.,* 819 S.W.2d at 429 (construction manager who negligently supplied information regarding the construction project held liable to subcontractor who relied upon the information in performing work at the site); *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (1970) (land surveyor who negligently prepared a plat for the purchaser of property held liable to sellers because he had full knowledge that the survey was to be used for describing the property in the warranty deed upon which both the sellers and buyers would rely); *Shelby v. Delta Air Lines, Inc.,* 842 F.Supp. 999, 1015 (M.D. Tenn. 1993) ("The Tennessee cases involving negligent misrepresentation all involve commercial transactions.").
>
> In contrast, the advice alleged given by Omer, upon which Robinson claims to have relied, was not provided for the guidance of Lineberry and Robinson in a business transaction. Indeed, the conduct of Lineberry and Robinson, in no way, was related to a commercial or business transaction. . . .

> … 

> … Robinson's negligent misrepresentation claim must fail because that advice was not given for the guidance of Lineberry or Robinson in their business transactions. *See Shelby*, 842 F.Supp. at 1015 ("[T]he language of Section 552 expressly refers to the negligent supplying of false information 'for the guidance of others in their *business transactions*.'") (emphasis in original) (applying Tennessee law); *see also Pickering v. Pickering*, 434 N.W.2d 758, 762 (S.D. 1989) (husband's claim of negligent misrepresentation against wife for misleading him about the paternity of a child born during their marriage failed because it did not arise from a commercial or business transaction).

*Id*. at 427-28 (emphasis added). The requirement that the misrepresentation was made "for the guidance of others in their business transactions" is an essential element of the tort of negligent misrepresentation. *Allen v. Steele*, 252 P.3d 476, 483 (Colo. 2011). The element is separate and in addition to the element that the defendant attorney made the misrepresentation "in the course of his business, profession or employment." *Id.*

The Colorado Supreme Court in *Allen* addressed what constitutes a "business transaction" in a negligent misrepresentation claim. The *Allen* Court noted:

> The "guidance of others in their business transactions" element means that the defendant attorney provided information to guide others, meaning, to guide the recipient of the information, in his or her business transactions. The recipient of the information could fall into two classes of people. First, the recipient could be a third party, to whom the attorney provides guidance at the request of his or her client. Second, in a situation such as the case at hand, the recipient could be a non-client, to whom the attorney provides information directly.

> … [To] determine whether a potential lawsuit against another party can satisfy the element of a "business transaction[,]" [w]e look to the comments to section 552 of the Restatement. The comments discuss liability in terms of "commercial transactions" and state that "[b]y limiting the liability for negligence of a supplier of information to be used in commercial transactions . . . the law promotes the important social policy of encouraging the flow of commercial

information upon which the operation of the economy rests." Restatement (Second) of Torts § 552 cmt. a.

Common usage supports the Restatement's explanation that a business transaction is a commercial transaction. *Black's Law Dictionary* defines "business" as a "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." Black's Law Dictionary 226 (9th ed. 2009). A "business transaction" is defined as an "action that affects the actor's financial or economic interest, including the making of a contract." *Id.* at 227.

We further note that comment c on Subsection (1) of Section 552 of Restatement (Second) of Torts states that the rule "applies only when the defendant has a pecuniary interest in the transaction in which the information is given. If he has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it." Comment d reflects that

[t]he defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him for it or paid in a transaction in the course of and as a part of which it is supplied . . . .

… [W]hen one who is engaged in a business or profession steps entirely outside of it, as when an attorney gives a casual and offhand opinion on a point of law to a friend . . . it is not to be regarded as given in the course of his business or profession; and since he has no other interest in it, it is considered purely gratuitous. The recipient of the information is not justified in expecting that his informant will exercise the care and skill that is necessary to insure a correct opinion and is only justified in expecting that the opinion be an honest one.

In our view, at the time the parties spoke, Edge was not giving advice for the guidance of Batten in a business transaction but was gratuitously helping him with a personal matter. She was not acting in a transaction in which she had a pecuniary interest. The trial court correctly dismissed the claim for negligent misrepresentation on summary judgment.

**Attorney's Fees**

- 40 -

On March 6, 2017, Bank filed its application for attorneys' fees, seeking an award of $332,553.88. Contending that the litigation involved a dispute and/or a question of interpretation related to the employment agreement, Bank relied upon Paragraph 16 of the employment agreement as the grounds and authority for its request for an award of attorney's fees and expenses:

> **16. PAYMENT OF LEGAL FEES.** All reasonable legal fees paid or incurred by the Bank or Batten pursuant to any dispute or question of interpretation relating to the Agreement shall be reimbursed to the prevailing party in any judgment, arbitration or settlement.

On October 27, 2017, the trial court entered an award to Bank of $294,965.18.

Generally, "[l]itigants must pay their own attorney's fees absent a statute or agreement providing otherwise." *J & B Inv., LLC v. Surti*, 258 S.W.3d 127, 138 (Tenn. Ct. App. 2007) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Tennessee follows the American rule, which permits a civil party litigant to "recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Epperson*, 284 S.W.3d at 308. The decision to follow the American rule is based on several public policy considerations. *Id.* "[A]s a general principle, the American rule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case." *Id.* at 309 (citing *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008)).

"The entitlement to recover attorney's fees . . . is limited to the situation agreed to by the parties in the contract, and the fee provision is subject to the rules of contract interpretations." *J & B Inv.*, 258 S.W.3d at 138 (internal citation omitted). Tennessee only allows this exception to the American rule "when a contract specifically or expressly provides for the recovery of attorney fees." *Epperson*, 284 S.W.3d at 309 (citing *House*, 245 S.W.3d at 377). "The only way parties to a contract have been able to specifically and expressly create a right to recover attorney fees has been by incorporating the phrase 'including reasonable attorney fees' or some other similar, yet equally specific contractual language." *Epperson*, 284 S.W.3d at 310. Contract provisions that award attorney's fees to the prevailing party will be strictly construed. *Starnes Family Office, LLC v. McCullar*, No. 10-2186, 2012 WL 566749, at *1 (W.D. Tenn. Feb. 21, 2012).

An award of attorney's fees is within the trial court's discretion and will not be overturned absent an abuse of discretion. *Wright*, 337 S.W.3d at 176. In reviewing the award, we look at the evidence in the light most favorable to the trial court's decision. *Id.* Thus, we are required to uphold the trial court's ruling "as long as reasonable minds

could disagree about its correctness," and "we are not permitted to substitute our judgment for that of the trial court." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007).

Tennessee courts have defined the "prevailing party" as "the party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue . . . . The one in whose favor the decision or verdict is rendered and judgment entered." *Diary Gold, Inc. v. Thomas*, No. E2001-02463-COA-R3-CV, 2002 WL 1751193, at *4 (Tenn. Ct. App. July 29, 2002). A determination of who is the "prevailing party" under the employment agreement required the court "to apply the legal principles relative to the interpretation and construction of contracts." *Id.* (citing *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000)). Accordingly, this court should review the trial court's legal determination of whether Bank was the "prevailing party" pursuant to the employment agreement de novo without any presumption of correctness.

Batten argues that Bank should not be considered as a "prevailing" party for the purposes of its application for attorney's fees because it did not prevail under the terms of the involved contractual obligations, facts, and law as they existed at the time of the filing of Batten's cause of action. Batten asserts that Bank recovered fees only because it convinced the trial court to accept a "disingenuous" reading of the contract and a "mischaracterization" of the litigation. He argues that the litigation's actual focus was the golden parachute issue.

Batten also claims that the fees awarded are not reasonable and contain charges for, *inter alia*, duplicative efforts, multiple attorneys and support staff, and communication between Bank's current and former attorneys. He contends Bank is seeking, "in addition to litigation costs," reimbursement for the preparation of litigation updates for bank examiners and shareholders. Finally, Batten notes that although Bank's current attorneys have submitted an affidavit and bills substantiating their request for a total award of $256,233.57, the bills (totaling $76,320.31) submitted from the former attorneys had no supporting affidavit.

Batten's suit against Bank is one for breach of contract and, therefore, it "relates" to the employment agreement. FDIC's interpretation and application of the golden parachute regulations involved the severance provision in the employment agreement. Based on the plain terms of the attorney's fee provision in Batten's contract, Bank was entitled to the enforcement of its contractual right to recover reasonable attorney's fees and expenses in this litigation. Bank successfully defended itself in this case and, as the trial court ruled, is entitled to its fees pursuant to the agreement.

As to Batten's claims that any portion of Bank's fee award was excessive, duplicative, or unreasonable, Bank presented the trial court with sufficient proof to refute

the contentions.  Batten has failed to establish that the trial court abused its discretion in its fee rulings.  He has therefore failed to carry his burden to overturn the attorney's fee award.

## V.  CONCLUSION

The judgment of the trial court is affirmed and the case remanded for such further proceedings as may be necessary.  Costs of the appeal are assessed against the appellant, C. Bruce Batten.

_____
JOHN W. MCCLARTY, JUDGE